UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CHRIS RANDALL                                                                    PLAINTIFF

v.                                               CIVIL ACTION NO. 3:21-CV-00378

TT OF C. LOUISVILLE, INC. d/b/a/ LOUISVILLE                  DEFENDANTS
CHRYSLER DODGE JEEP RAM
and
AMERICAN CREDIT ACCEPTANCE, LLC

## **MEMORANDUM OPINION**

       This matter is before the Court on the motion of Defendant TT of C. Louisville, Inc. d/b/a Louisville Chrysler Dodge Jeep Ram ("TTCL") to dismiss and compel arbitration (DN 5) and on the motion of Defendant American Credit Acceptance, LLC ("ACA") to compel arbitration and stay case (DN 6). TTCL and ACA will be collectively referred to as "Defendants." Plaintiff Chris Randall ("Randall") has responded to both motions (DN 10) and Defendants have replied (DN 11). These matters are now ripe for adjudication.

       *I.*    *Procedural Posture of Case*

       Randall filed a complaint with this Court in June 2021 claiming that TTCL had committed several violations of the Truth in Lending Act (TLA), 15 U.S.C. § 1601, during Randall's purchase of a vehicle from TTCL in June 2020. DN 1, PageID# 1, 3. Randall also alleged multiple statutory and common law claims against TTCL under Kentucky law. *Id.*, PageID# 10-15. Randall asserts that ACA is subject to all claims against TTCL, due to ACA's purchase of Randall's vehicle loan from TTCL. *Id.*, PageID# 3, 5. In July 2021, Defendant TTCL filed a motion to dismiss and to

1

compel arbitration (DN 5) and Defendant ACA filed a motion to compel arbitration and to stay the case (DN 6). Based on the briefing, it appears that ACA has abandoned the motion to stay and now both Defendants are asking the Court to compel arbitration and dismiss. *See* DN 11, PageID# 132.

## II.     Factual Background

In June 2020, Randall visited the TTCL vehicle showroom and ultimately decided to purchase a vehicle. DN 1, PageID# 3. Randall signed some of the paperwork that day and completed the remaining paperwork the following day. *Id.*, PageID# 4-5. By the end of those two days, Randall had executed several documents, including a Retail Installment Sales Contract ("RISC") and a Bill of Sale. *Id.*, PageID# 14. Both the Bill of Sale and the RISC (the "Purchase Contracts," collectively) included an Arbitration Provision, providing that either party could choose to have any dispute arising from the Purchase Contracts decided by a neutral arbitrator rather than in a court of law and that such arbitration would be governed by the Federal Arbitration Act ("FAA"). DN 5-3, PageID# 63.

At the time the sale was executed, TTCL did not provide Randall with copies of any of the documents he had signed. *Id.* Randall did not receive his own copies of these documents until July 15, 2020, after requesting them several times. DN 1, PageID# 5-6. In the set of copies Randall was given on July 15, the RISC is marked with a stamp reading "Consumer/Truth in Lending Copy." DN 10-1, PageID# 119. On July 24, 2020, Randall received in the mail a second set of signed documents. *Id.*, PageID# 6. The RISC in this set of copies is marked with a "Dealer Copy" stamp. DN 10-1, PageID# 120. In early July 2020, Randall was informed that TTCL's interest in Randall's RISC had been assigned to ACA. *Id.*, PageID# 5; DN 6-1, PageID# 71.

### A.  RISC

The RISC appears to be a single page, double-sided document. DN 5-3. At the top of the front page is the statement, "You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. **By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract**." DN 5-3, PageID# 60.

There are four total visible signatures on the RISC. First, a little more than half-way down from the top of the first page there is a box ("Agreement to Arbitrate" Signature Box) containing the clause ("Agreement to Arbitrate Clause"):

> **Agreement to Arbitrate:** By signing below, you agree that pursuant to the Arbitration Provision on the reverse side of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate.

*Id.*, PageID# 61. A signature line for the buyer of the vehicle to sign is provided underneath this language and there is a visible signature on this line. *Id.*

Second, there is a box ("Optional Gap Contract" Signature Box) where the buyer of the vehicle can sign to elect to purchase "gap" insurance. *Id.* There is a visible signature in this box. *Id.* Third, toward the bottom of the page there is a box ("How this Contract Can be Changed" Signature Box) containing the provision:

> **HOW THIS CONTRACT CAN BE CHANGED:** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.

A signature line is provided just after this language and there is a visible signature on this line. *Id.* The clause "**[s]ee back for other important agreements**" is included in the paragraph that follows this signature line. *Id.*

Finally, subsequent to the language above, is the provision:

3

> **You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You acknowledge that you have read both sides of this contract, including the arbitration provision on the reverse side, before signing below. You confirm that you received a completely filled-in copy when you signed it.**

DN 5-3, PageID# 61. Just below this provision is a signature line ("RISC Signature Line") containing a visible signature. *Id.*

On the back side of the RISC, at the top, reads "OTHER IMPORTANT AGREEMENTS," underneath of which is a line that crosses the width of the page. *Id.*, PageID# 62. Below this line are five separately numbered paragraphs, some with subsections, that describe the financing and other terms of the RISC. *Id.*, PageID# 62-63. At the very bottom of the page is a separate box containing the Arbitration Provision. *Id.*, PageID# 63.

### B. Bill of Sale

The Bill of Sale also appears to be a single page, double-sided document. DN 5-2. At the bottom on the front of the document is a box containing the following language:

> **Buyer agrees that this Agreement includes all of the terms and conditions on the front and back side of hereof, that this Agreement cancels and supersedes any prior agreement including oral agreements, and as of the date below comprises; together with any retail installment sale contract or lease the complete and exclusive statement of the terms of the agreement relating to the subject matters covered by this Agreement. Buyer, by signing this Agreement, acknowledges that Buyer has read and agrees to its terms and has received a true copy of this Agreement.**

*Id.*, PageID# 57. Below this paragraph is a small checkbox with the following text next to it and a signature line ("Bill of Sale Signature Line") for the buyer just underneath: "BUYER ACKNOWLEDGES THAT IF THIS BOX IS CHECKED, THIS AGREEMENT CONTAINS AN

ARBITRATION PROVISION." *Id.* The box is not checked but a signature is visible on the signature line. *Id.*

On the reverse side of the Bill of Sale is the phrase, "ADDITIONAL TERMS AND CONDITIONS," with fifteen separately numbered paragraphs describing various provisions of the Bill of Sale. *Id.*, PageID# 58. As with the RISC, the Arbitration Provision is in a separate box at the very bottom of the backside of the Bill of Sale. *Id.*

### III. *Claims Against Defendants, Defendants' Motions, and Randall's Response*

In his complaint against TTCL, Randall alleges that during the vehicle purchase process, TTCL violated various laws, including the TLA. DN 1, PageID# 1. Randall seeks to impose liability on ACA based on its interest in Randall's RISC. *Id.*, PageID# 2. In the instant motion, Defendants maintain that Randall's claims must be settled through arbitration rather than in court and, therefore, Randall should be compelled to arbitrate and the legal action against them dismissed. DN 11, PageID# 132.

According to Defendants, upon signing the Purchase Contracts in June 2020, Randall entered into "a valid and enforceable agreement to arbitrate" with TTCL and, after the assignment to ACA, the terms of the RISC bound Randall and ACA to this same arbitration agreement. DN 5-1, PageID# 49-50; DN 6-1, PageID# 71. The Arbitration Provision provides that either party can "choose to have any dispute between [Randall and Defendants] decided by arbitration and not in court by jury trial." DN 5-1, PageID# 49 (quoting DN 5-3, PageID# 63). As such, Defendants maintain that Randall cannot deny them the right to resolve the claims against them via arbitration rather than in court. DN 5-1, PageID# 43; DN 6-1, PageID# 71.

Randall maintains that he cannot be compelled to arbitrate his claims against Defendants because a valid agreement to arbitrate never existed between the parties. DN 10, PageID# 101.

5

According to Randall, several signatures on the Bill of Sale and the RISC were forged. DN 10, PageID# 100; Randall Affidavit, DN 10-1, PageID# 118. Specifically, Randall contests the authenticity of the signature in the "Agreement to Arbitrate" Signature Box on both the Dealer and Consumer/Truth in Lending Copies of the RISC form. DN 10-1, PageID# 118. As evidence, Randall points to certain discrepancies between the signatures on the Consumer/Truth in Lending Copy of the signed documents that TTCL provided to him on July 15 and the signatures on the Dealer Copy of the signed documents that he received in the mail from TTCL on July 24. *Id.*, PageID# 105-07. He further claims that the signatures at the bottom of the Bill of Sale and the RISC are forgeries. *Id.* On this basis, Randall claims that he has offered sufficient evidence to bring the existence of an arbitration agreement into question and that, pursuant to 9 U.S.C. § 4, he is entitled to a determination by the Court as to whether there was such an agreement before the matter is submitted to arbitration. DN 10, PageID# 109.

### IV.     *Legal Standard for Motion to Compel Arbitration*

Under section 4 of the FAA, the parties to a written agreement to arbitrate can petition the district court to compel arbitration. 9 U.S.C. § 4. When presented with such a petition, the district court "must make a number of threshold determinations." *Glazer v. Lehman Bros.*, 394 F.3d 444, 451 (6th Cir. 2005).

> [F]irst, [the court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Id.* (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)). The current dispute is centered only on the first prong of this analysis—that is whether the parties agreed to arbitrate.

6

Kentucky law governs whether an agreement to arbitrate was formed. *Aldrich v. Univ. of Phx., Inc.*, 661 F. App'x 384, 390 (6th Cir. 2016) (citation omitted). In Kentucky, "the party seeking to enforce an agreement" must make a prima facie showing that the agreement exists. *Davis v. Glob. Client Sols., LLC*, 765 F. Supp. 2d 937, 940 (W.D. Ky. 2011) (quoting *Louisville Peterbilt, Inc. v. Cox*, 132 S.W.3d 850, 857 (Ky. 2004) (internal quotation marks omitted)). This prima facie burden can be met "by providing copies of a written and signed agreement to arbitrate." *MHC Kenworth-Knoxville/Nashville v. M & H Trucking, LLC*, 392 S.W.3d 903, 906 (Ky. 2013) (quoting *Louisville Peterbilt*, 132 S.W.3d at 857 (internal punctuation and quotation marks omitted)).

A "heavy" burden then shifts to the party resisting arbitration, who must put the agreement to arbitrate "in issue" by evidencing "a genuine issue of material fact as to [the agreement's] validity." *Id.*; *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). Agreements to arbitrate may be invalidated by "applicable state-law contract defenses like fraud, forgery, duress, mistake, lack of consideration or mutual obligation, or unconscionability." *Ggnsc Louisville Hillcreek, LLC v. Dockery*, Civil Action No. 3:15-cv-908-DJH, 2016 U.S. Dist. LEXIS 132253, at *8-9 (W.D. Ky. Sep. 27, 2016) (quoting *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498) (6th Cir. 2004) (quotation marks omitted).

The court must draw "all facts and inferences. . . in the light most favorable to the [nonmovant], and determine[s] whether the evidence presented is such that a reasonable finder of fact could conclude that no valid agreement to arbitrate exists." *Great Earth Cos.*, 288 F.3d at 889 (citations omitted). The language of the contract, however, must be viewed "'in light of the strong federal policy in favor of arbitration [and] any ambiguities in the contract or doubts as to the

parties' intentions should be resolved in favor of arbitration.'" *Id.* (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)).

If the Court "is satisfied that . . . the formation of the parties' arbitration agreement . . . is [not] in issue," then the Court must order arbitration. *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). However, if the party resisting arbitration has put the making of the arbitration agreement in issue:

> [T]he court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, . . . the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, . . . on or before the return day of the notice of application, demand a jury trial of such issue.

9 U.S.C.S. § 4.

### V.     Analysis

Defendants have presented written and signed copies of the RISC and Bill of Sale, each including an Arbitration Provision, and, thus, have established a prima facie case that an arbitration agreement exists between the parties. DN 11, PageID# 131 (citing to DN 5-2 and DN 5-3).[1] The copy of the RISC put into evidence by Defendants is marked with a "File Copy" stamp. DN 5-3, PageID# 61. The question before the Court is whether Randall has put the validity of the agreement to arbitrate "in issue" by showing that there is a genuine issue of material fact as to his assent. If so, this issue must be resolved before Randall can be compelled to arbitrate his claims.

---

[1] The Court takes notice of Randall's argument that Defendants have failed to show that a signed arbitration agreement exists between the parties. DN 10, PageID# 110. This argument is without merit. Randall cites no authority for the proposition that the arbitration agreement put into evidence by Defendants "must be properly authenticated by the party seeking to offer [the agreement] in support of [the] motion" to compel or that "[m]erely attaching the purported arbitration agreement(s) at issue does not carry the day for Defendants to compel arbitration." *Id.* As discussed in this opinion, the Court is guided by Kentucky contract law, under which Defendants can meet their evidentiary burden "by providing copies of a written and signed agreement to arbitrate." *MHC Kenworth-Knoxville/Nashville v. M & H Trucking, LLC*, 392 S.W.3d 903, 906 (Ky. 2013) (quoting *Louisville Peterbilt*, 132 S.W.3d at 857 (internal punctuation and quotation marks omitted).

8

The Court will first assess the Purchase Contracts to determine which signatures are sufficient to evidence assent to the Arbitration Provision. Then, the Court will determine if Randall has offered evidence to call into question the authenticity of any such signature and, hence, has put the validity of the arbitration agreement "in issue."

### A. *Sufficiency of Signatures*

Generally, in Kentucky "one who signs a contract is presumed to know its contents, and ... if he has an opportunity to read the contract which he signs he is bound by its provisions." *Hathaway v. Eckerle*, 336 S.W.3d 83, 89-90 (Ky. 2011) (quoting *Clark v. Brewer*, 329 S.W.2d 384, 387 (Ky. 1959)).[2] This broad principle was curbed somewhat by the Kentucky Supreme Court in *Dixon v. Daymar Colleges Group, LLC*, when the court declined to bind the student-plaintiffs to an arbitration provision located below the signature line of an agreement. 483 S.W.3d 332, 346 n.46 (Ky. 2015). The court grounded its reasoning in a Kentucky statute mandating that "[w]hen the law requires any writing to be signed by a party thereto, it shall not be deemed to be signed unless the signature is subscribed at the end or close of the writing." *Id.* at 344 (citing to Ky. Rev. Stat. § 446.060).[3] Thus, "any part of a commercial writing appearing below the signature line does not become part of the contract." *Consol. Aluminum Corp. v. Krieger*, 710 S.W.2d 869, 872 (Ky. Ct. App. 1986) (citing *R.C. Durr Co., Inc. v. Bennett Industries, Inc.*, Ky. App., 590 S.W.2d 338, 340 (1979)).

In *Dixon*, the agreement between the parties, including the provision regarding arbitration, was required to be in writing and signed under Kentucky's Statute of Frauds, as performance could

---

[2] *See also LP Louisville E., LLC v. Patton*, 621 S.W.3d 386, 401 (Ky. 2020) ("[A] person is presumed to know those things which reasonable diligence on his part would bring to his attention.").
[3] This is because, "'[w]hen the signature is in the middle of a writing, it gives no assurance that the contracting parties intend to be bound by matters which do not appear above their signatures.'" *Consol. Aluminum Corp. v. Krieger*, 710 S.W.2d 869, 873 (Ky. Ct. App. 1986) (quoting *Bartelt Aviation, Inc. v. Dry Lake Coal Co.*, 682 S.W.2d 796, 797 (Ky. App. 1985)).

9

not be completed within one year. *Id.* at 343 (citing Kev. Rev. Stat. § 371.0.0(7)). Because the signature in *Dixon* was at the bottom of the front page, "before any of the terms on the reverse side," the court stated that the arbitration provision had "not been made part of the Agreement." 483 S.W.3d at 345. Although contract terms appearing after the signature can be incorporated by reference,[4] the problem in *Dixon* was that Daymar failed to properly incorporate the arbitration provision. 483 S.W.3d at 345. Above the signature line was a paragraph that included the following text: "This Agreement and any applicable amendments, which are incorporated herein by reference, are the full and complete agreement between me and the college." *Id.* at 345. The court noted that "the only true incorporating language in the Agreement applies solely to 'any applicable amendments' [and] . . . [i]t is beyond dispute that the arbitration provision, an original term in the Agreement, cannot be an 'applicable amendment.'" *Id.*

The court also indicated that the arbitration clause was not saved by a provision above the signature line where students wrote their initials to confirm that they had "read both pages of this . . . agreement before [signing] it" and had "received a copy of it after [signing] it." *Id.* at 345-46. According to the court, "[t]his provision is plagued by the absence of any language indicating that the Students actually assent to the terms referenced, not to mention any indication that any terms are actually being incorporated. Instead, the provision only indicates that the Students have read the terms." *Id.* at 346. The court stated that the language around this "read" provision also indicated that "it was not intended to serve an incorporation function but, perhaps, only to bring awareness

---

[4] Such incorporation is allowed "'when a signature is placed after clear language [that] has expressed the incorporation of other terms and conditions by reference.'" *Consol. Aluminum Corp.*, 710 S.W.2d at 873 (quoting *Bartelt Aviation, Inc.*, 682 S.W.2d at 797).

to the terms" by "notify[ing] the Students that the Agreement continued past their signature, rather than incorporat[ing] the back-page language above the signature." *Id.*[5]

In the present case, the agreement between the parties, and thus the Arbitration Provision, is required to be in writing under Kentucky's Uniform Commercial Code Statute of Frauds. Ky. Rev. Stat. § 355.2-201(1) ("Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties."). Therefore, as in *Dixon*, Kentucky law mandates that a signature be provided at the end of the agreement. Ky. Rev. Stat. § 446.060. Also like *Dixon*, the Arbitration Provision on both the RISC and Bill of Sales forms is on the reverse side of the page containing the signature line. *See* DN 5-2 and DN 5-3. The clauses in the RISC[6] and Bill of Sale[7] above the signature lines requiring the signer to verify that he has "read," "reviewed," and "received" the document before signing do not evidence assent to the terms below the signature line. Consequently, a signature on the RISC Signature Line or the Bill of Sale Signature Line—each at the bottom of the front page of the respective document—will only evidence assent to the Arbitration Provision if the Court finds the provision is properly incorporated into the contract. The Court's analysis is limited to only the incorporation of the Arbitration Provision. Whether the financial and other terms on the reverse side of the RISC are incorporated into the contract is an issue that is reserved for arbitration.

Before assessing the Purchase Contracts, the Court will address Randall's contention that the signatures on the RISC and Bill of Sale Signature Lines are both forgeries and, as such, cannot

---

[5] This holding echoed that from a previous case, in which the court stated: "Assent to be bound by the terms of an agreement must be expressed, and simply acknowledging the receipt of the document does not constitute assent to be bound." *Ally Cat, LLC v. Chauvin*, 274 S.W.3d 451, 456 (Ky. 2009).
[6] DN 5-3 PageID# 61.
[7] DN 5-2, PageID# 57.

be used to show his assent to any term of the contract. DN 10, PageID# 113-14. This argument is without merit. Throughout the complaint and in the briefing, Randall acknowledges the existence of an agreement between the parties. For example, in his complaint Randall states that "[t]he parties entered into a consumer transaction on June 12, 2020 for the purchase and financing of a motor vehicle" and "[d]uring the sale and financing of the vehicle between June 12-13, 2020 Plaintiff was required by Chrysler to execute a number of documents among which were a 'Bill of Sale' [and] Retail installment sales contract." DN 1, PageID# 14. Thus, regardless of whether the copies of the documents presently in Randall's possession are, in fact, the copies that he signed, Randall has admitted to signing the Purchase Contracts. Nonetheless, for the reasons discussed below, the Court finds that Randall's signatures on the RISC and Bill of Sale Signature Lines do not evidence Randall's assent to the Arbitration Provision.

### 1. RISC

The separate Agreement to Arbitrate Signature Box on the front page of the document points toward the conclusion that the Arbitration Provision is not an incorporated term of the RISC. The Agreement to Arbitrate Clause in the Signature Box states, "[b]y signing *below*, you agree that pursuant to the Arbitration Provision on the reverse side of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action." DN 5-3, PageID# 61 (emphasis added). The existence of a separate Signature Box with its own signature line just "below" the Agreement to Arbitrate Clause leads to the reasonable inference that one must sign on that line—not just on the RISC Signature Line at the bottom of the document—in order to agree to the terms of the Arbitration Provision. If the drafters of this form intended that a signer would, with a single signature at the bottom of the form, assent to all terms on the front and back of the document—including the Arbitration Provision—they should have structured the form

12

accordingly. As it stands, Randall's signature on the RISC Signature Line is inadequate to demonstrate his assent to the Arbitration Provision on the back of the form.

### 2. Bill of Sale

The Bill of Sale expressly incorporates certain terms by stating, "this Agreement includes all of the terms and conditions on the front and back side hereof" and "this Agreement . . . comprises, together with any retail installment sale contract . . . the complete and exclusive statement of terms of the agreement relating to the subject matters covered by this Agreement." *Id.* Hence, pursuant to *Dixon*, the terms of the Bill of Sale include all "terms and conditions" on the front or back side of the Bill of Sale, as well as all the "terms and conditions" found in the RISC.

The Arbitration Provision is included on the back of the Bill of Sale under the heading "ADDITIONAL TERMS AND CONDITIONS." DN 5-2, PageID# 58. Therefore, at first glance it would appear that the Arbitration Provision is incorporated into the contract. However, this conclusion is subverted by the presence of an unchecked box just above the Bill of Sale Signature Line and next to the phrase "BUYER ACKNOWLEDGES THAT IF THIS BOX IS CHECKED, THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION." *Id.*, PageID# 57. Even after inspecting the Bill of Sale with "reasonable diligence," the logical inference is that the Arbitration Provision on the back is only included as a "term" or "condition" of the Bill of Sale if this checkbox is marked. With this checkbox left empty, Randall's signature on the Bill of Sale Signature Line is insufficient to prove his assent to be bound by the Arbitration Provision.

### B. *Authenticity of Signatures*

Having found that the signatures on the RISC and Bill of Sale Signature Lines are insufficient to evidence Randall's assent to the Arbitration Provision, this Court can only compel

13

arbitration if Randall signed the Agreement to Arbitrate Signature Box on the RISC. Randall claims that the signatures in the Agreement to Arbitrate Signature Box on the two copies of the RISC in his possession are both forgeries. DN 10-1, PageID# 118. "However, a plaintiff cannot avoid arbitration by simply denying facts upon which the right to arbitration rests but must have sufficient evidence to raise a factual issue regarding the validity of the agreement." *Mitchell v. Cambridge Franchise Holdings, LLC*, 433 F. Supp. 3d 1064, 1069 (W.D. Ky. 2020) (citation and punctuation omitted).[8] Randall has failed to raise such an issue.

In the record, Randall has entered the RISC form allegedly included in the Consumer/Truth in Lending Copy of the Purchase Contracts (referred to as "exhibit A" in Randall's affidavit) and the RISC form allegedly included in the Dealer Copy of the Purchase Contracts (referred to as "exhibit B" in Randall's affidavit). DN 10-1, PageID# 119, 120. Regarding the signatures on the two copies, Randall states:

> I . . . began to notice that a number of the signatures which appeared on both exhibits "A" and "B" were suspicious and did not appear to be genuine. Having examined them side by side I am certain that they are both forgeries. One of the things that first made me suspicious was the clear and obvious difference in both the signatures on each of the agreements to arbitrate. Further, the signature on exhibit "A" was made with "wet" or original ink where the signature on exhibit "B" appeared to be carbonized. Both could not have been made with a single signing. Additionally, the location where each signature appeared on the signature line was different; one signature began before the "x" where it provides "buyer signs" and the other signature began after the "x" where buyer signs.

---

[8] *See also Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002) ("Just as in summary judgment proceedings, a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." (citing *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)); *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992) ("To make a genuine issue entitling the [party seeking to avoid arbitration] to a trial by jury [on the arbitrability question], an unequivocal denial that the agreement had been made [is] needed, and some evidence should [be] produced to substantiate the denial." (alterations in original) (quoting *T & R Enters., Inc. v. Cont'l Grain Co.*, 613 F.2d 1272, 1278 (5th Cir. 1980) (quotation marks omitted)).

> Trying to account for these differences, it clearly appears that these signatures were signed at two different times which was not possible for me since we had just a single signing session; either on June 12th or 13th, 2020; and,
>
> Furthermore, the signatures at the end of each RISC where I supposedly "agree to the terms of this contract" as well as the signature at the bottom of Exh "C" which is the vehicle bill of sale are also forgeries.

DN 10, PageID# 107 (paragraph numbers omitted).

The Court first notes that Randall does not challenge the authenticity of his signature in the Agreement to Arbitrate Signature Box on the copy of the RISC put into the record by Defendants ("File Copy") and, thus, has not directly attacked the validity of the agreement to arbitrate that Defendants have evidenced. *Compare* DN 5-3, PageID# 61, *with* DN 10-1, PageID# 119-20. The "File Copy," "Consumer/Truth in Lending Copy," and "Dealer Copy" of the RISC appear to be carbon copies, meaning that in the original document, each was on a distinct sheet of paper and, in theory, each could have been signed on a separate occasion.

Randall's assertion "that it clearly appears that these signatures were signed at two different times which was not possible for me since we had just a single signing session" is belied by the factual account provided in his complaint, in which he states:

> Although paperwork was initiated on [June 12] the transaction could not be completed. . . . Essentially, this transaction was not completed and consummated until June 13, 2020. On June 13, 2020 Defendant contacted Plaintiff to come back and finish signing documentation and paperwork which he did.

DN 1, PageID# 4-5 (paragraph numbers omitted).[9] Thus, Randall has admitted that the paperwork was completed over more than "a single signing session." It is, therefore, entirely possible that

---

[9] *See also* DN 1, PageID# 14 ("During the sale and financing of the vehicle between June 12-13, 2020 Plaintiff was required by Chrysler to execute a number of documents among which were a "Bill of Sale", Retail installment sales contract [risc], First Mile GAP, AUL Service Contract, Spot Delivery Agreement, etc.").

15

"File Copy," "Consumer/Truth in Lending Copy," and "Dealer Copy" were not signed on the same occasion or with the same writing instrument.

Even disregarding this possibility, the evidence that Randall offers is insufficient to put the making of the agreement to arbitrate in issue. The Court is not persuaded by Randall's attempt to liken his case to that in *Prevost v. Burns Int'l Sec. Servs. Corp.*, 126 F. Supp. 2d 439, 442 (S.D. Tex. 2000). In *Prevost*, the court recognized that, in addition to a sworn affidavit denying that an arbitration agreement was made, "'some evidence should . . . [be] produced to substantiate the denial.'" 126 F. Supp. 2d at 442 (quoting *T & R Enters., Inc. v. Cont'l Grain Co.*, 613 F.2d 1272, 1278 (5th Cir. 1980)). Under this evidentiary standard, the court reviewed the plaintiff's purported signature across multiple documents, including those submitted by the defendant and other exemplar documents containing the plaintiff's authenticated signature, such as the plaintiff's driver's license and social security card. 126 F. Supp. 2d at 441-42. The court found that the plaintiff had put the authenticity of the signature on the arbitration agreement in issue because this signature had a distinctly different style than the plaintiff's signatures that were known to be authentic. *Id.*

Randall relies solely on discrepancies between the signature in the Agreement to Arbitrate Signature Box on the Consumer/Truth in Lending Copy of the RISC and the signature in the Agreement to Arbitrate Signature Box on the Dealer Copy of the RISC to support his assertion that both signatures are forgeries. He does not claim or suggest that these allegedly forged signatures differ from his authentic signature found elsewhere in the Purchase Contracts[10] or on "exemplar" documents. As such, Randall has not provided sufficient evidence to allow a trier of fact to conclude that the signatures in the Agreement to Arbitrate Signature Box on the

---

[10] Randall does not challenge the authenticity of his signatures in the "Optional Gap Contract" or "How this Contract Can be Changed" Signature Boxes on any copy of the RISC.

16

Consumer/Truth in Lending and Dealer Copies are not Randall's authentic signatures, i.e. that the signatures are forgeries.

For the reasons cited above, the Court holds that Defendants have established a prima facie case that an agreement to arbitrate exists between the parties and Randall has not offered sufficient evidence to show that a genuine issue of material fact exists as to the validity of this agreement. The parties to not dispute the scope of the Arbitration Provision or the arbitrability of the claims. As such, the Court will grant Defendants' motion to compel arbitration.

### C. *Status of Case*

The remaining issue to be decided by this Court is whether the present action should be dismissed entirely or stayed pending arbitration. Pursuant to section 3 of the FAA, the court shall, "upon being satisfied that the issue involved . . . is referable to arbitration . . . on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C. § 3. There is a split in the federal circuits as to how section 3 is to be applied. *See Anderson v. Charter Communs., Inc.*, 860 F. App'x 374, 379-80 (6th Cir. 2021). Some circuits require "a district court to stay a case if a party requests that remedy, which means that the court may not dismiss the case outright even when sending all claims to arbitration." *Id.* at 379. Other circuits allow a district court to "dismiss an action rather than stay it where it is clear the entire controversy between the parties will be resolved by arbitration." *Id.* at 380 (quoting *Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769-70 (8th Cir. 2011)) (internal quotation marks omitted).

The Sixth Circuit has followed the latter approach in unpublished opinions, but in a recent opinion that has been recommended for publication the court indicated that the "command [in section 3 of the FAA] that a district court 'shall on application of one of the parties stay the trial

of the action' conveys a mandatory obligation." *Arabian Motors Grp. W.L.L. v. Ford Motor Co.*, No. 20-2112/2152, 2021 U.S. App. LEXIS 35811, at *7 (6th Cir. Dec. 3, 2021). While declining "to adopt an absolute rule," the court noted that the Congressional intent behind the FAA was for "district courts to grant a stay when a party moves for one in this context," with "few, if any, exceptions." *Id.* at *9-*10. The only possible "exceptions" identified by the court in *Arabian Motors* were if "the dispute is moot or suffers from some other pleading or procedural defect," "both parties request a dismissal," or "neither party asks for a stay," although the court did not imply that this was an exhaustive list of "situations in which a dismissal remains permissible." *Id.* at *9.

In the present case, Defendants ask the Court to compel arbitration and dismiss the case. DN 11, PageID# 132. Randall, on the other hand, states in his response brief that he "believes that the Court, even if it grants Defendants' motion, must retain jurisdiction over this matter for any ultimate outcome and not dismiss the case with prejudice." DN, 10, PageID# 99. In light of the Sixth Circuit's holding in *Arabian Motors*, the Court will grant Randall's request to stay the instant action pending arbitration.

February 15, 2022

Charles R. Simpson III, Senior Judge
United States District Court

18